United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PATRICIA POLANCO, et al.,

       Plaintiffs,

   v.

STATE OF CALIFORNIA, et al.,

       Defendants.

Case No. 21-cv-06516-CRB

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

On May 30, 2020, high-level officials at certain California agencies—including the California Department of Corrections and Rehabilitation (CDCR) and San Quentin State Prison—ordered the transfer of 122 inmates at high risk of COVID-19 from the California Institution for Men (CIM), where there were 600 confirmed COVID-19 cases, to San Quentin, where there were none. The inmates were transported on overcrowded buses without having been tested for COVID-19 or properly screened. At San Quentin, they were housed in open-air cells and mingled with the local prison population.

The ensuing COVID-19 outbreak in San Quentin killed 26 inmates and one correctional officer. That officer was Sergeant Gilbert Polanco, a 55-year-old man with high-risk factors. For several weeks in June, Polanco's duties included (among other things) transporting inmates to the hospital in unsanitized vehicles and without personal protective equipment (PPE). He contracted COVID-19 in late June and died on August 9.

Plaintiffs Patricia, Vincent, and Selena Polanco bring this lawsuit against various state agencies and ten high-level officials at CDCR, San Quentin, and CIM. Plaintiffs argue that Defendants are liable under 42 U.S.C. § 1983 for violating Polanco's and their own constitutional rights by failing to protect Polanco from a state-created danger. They

United States District Court
Northern District of California

also contend that Defendants violated the Rehabilitation Act and California's Bane Act, and negligently inflicted emotional distress on Plaintiffs.  Defendants move to dismiss.

The Court GRANTS the motion to dismiss with respect to (1) the Section 1983 claims against the CIM Defendants; (2) the Bane Act claim; and (3) the negligent infliction of emotional distress claim.  The Court DENIES the motion as to (1) the Section 1983 claims against the CDCR/San Quentin Defendants; and (2) the Rehabilitation Act claim.  The Court grants Plaintiffs leave to amend.

## I.    BACKGROUND

### A.    Parties

Gilbert Polanco died of complications from COVID-19 on August 9, 2020 at the age of 55.  Compl. (dkt. 1) ¶ 26.  He was a Sergeant at San Quentin, where he had begun his career as a corrections officer at the age of 21.  Id.

Plaintiffs are Patricia Polanco, the wife of Gilbert Polanco, and Vincent and Selena Polanco, his two children.  Compl. ¶ 4.  All are his successors-in-interest pursuant to California law.  Id.; see Cal. Civ. Proc. Code § 377.11.  They bring these claims individually and as his successors-in-interest.  Compl. ¶ 4.

The Institutional Defendants are the State of California, CDCR, and San Quentin.  (Plaintiffs are suing the Institutional Defendants for their Rehabilitation Act claim only.)  CDCR is a state agency.  Id. ¶ 7.  San Quentin is a state prison under CDCR.  Id. ¶ 8.

Plaintiffs have sued ten named Individual Defendants and twenty Does, all in their individual capacities.  See id. ¶¶ 9-18, 19, 20.  The Court will group the ten named Individual Defendants in two groups based on their alleged duties and their placement in the CDCR/San Quentin hierarchy.

The first group is CDCR/San Quentin Defendants.  This group includes Ralph Diaz, the "Secretary, and highest policymaking official, of CDCR," id. ¶ 9; Estate of Dr. Robert S. Tharratt, who was the "Medical Director and a policymaking official of CDCR," id. ¶ 10; Ronald Davis, the "Warden of San Quentin," id. ¶ 11; Ronald Broomfield, the "Acting Warden of San Quentin," id. ¶ 12; Clarence Cryer, the "Chief Executive Officer for Health

Care [] of San Quentin," id. ¶ 13; Dr. Alison Pachynski, the "Chief Medical Executive of San Quentin," id. ¶ 14; and Dr. Shannon Garrigan, the "Chief Physician and Surgeon of San Quentin," id. ¶ 15.

The second group is CIM Defendants.  This group includes Louie Escobell, R.N., the "Chief Executive Officer for Health Care" of CIM, id. ¶ 16; Dr. Muhammad Farooq, the "Chief Medical Executive of CIM," id. ¶ 17; and Dr. Kirk Torres, the "Chief Physician and Surgeon of CIM," id. ¶ 18.

Further allegations as to the responsibilities of each of these individuals are not reproduced here.  Where relevant, they will be discussed in the following sections.

**B.      The Inmate Transfer**

In light of the COVID-19 pandemic, on March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency in California.  Id. ¶ 28.  Around this time, Defendants were "briefed and warned about the grave danger to health and life posed by the COVID-19 outbreak, including the highly transmissible nature of the virus and the necessity for precautions" such as "quarantine of those known or suspected to have been exposed to the virus, the need for cleanliness, social distancing, and personal protective equipment, and the need to regularly test for virus carriers."  Id.  A county shelter-in-place order was enacted on March 16, followed by a statewide order on March 19.  Id. ¶¶ 29, 31.  On March 18, the Interim Executive Director of the Habeas Corpus Resource Center, the State Public Defender, Mary McComb, and others responsible for representing people on death row sent a letter to Broomfield and Dr. Pachynski.  Id. ¶ 30.  The letter implored San Quentin to provide inmates with PPE and cleaning supplies, to allow for social distancing, and to enact other policies to protect the health of inmates and staff.  Id.

On March 24, Governor Newsom issued Executive Order N-36-20, suspending intake of inmates into all state facilities for 30 days.  Id. ¶ 32.  On information and belief, it was extended a further 30 days.  Id.  "[U]ntil late May, 2020, California Correctional Health Care Services (CCHCS) had opposed transfers of inmates between prisons, saying that 'mass movement of high-risk inmates between institutions without outbreaks is ill-

advised and potentially dangerous' and noting that it 'carries significant risk of spreading transmission of the disease between institutions.'" Id.

Nonetheless, on May 30, 2020, Defendants ordered the transfer to San Quentin of 122 inmates from the California Institution for Men (CIM), a state prison under CDCR that is located in Chino, California.  Id. ¶ 34.  At the time, San Quentin had no COVID-19 cases; CIM, however, was "struggling with a severe outbreak of COVID-19, which by then had reportedly infected over 600 inmates and killed 9 of them."  Id.  "Most or all of the men who were transferred had not been tested for COVID-19 for at least approximately three or four weeks."  Id.  "The transferred inmates also were not properly screened for current symptoms immediately before being placed on a bus."  Id.  In fact, a report by the California Office of the Inspector General (OIG) later found that "a [CIM] health care executive explicitly ordered that the incarcerated persons not be retested the day before the transfers began, and multiple CCHCS and departmental executives were aware of the outdated nature of the tests before the transfers occurred."  Id. ¶ 50.  The inmates were "packed onto buses in numbers far exceeding COVID-capacity limits that CDCR had mandated for inmate safety."  Id. ¶ 34; see id. ¶¶ 50-51 (California OIG report's description of the decision to increase the number of people on the buses as "inexplicable" and "not simply an oversight, but a conscious decision made by prison and CCHCS executives").

Defendants placed the new inmates in the "Badger housing unit, where tiers of open-air cells open into a shared atrium."  Id. ¶ 35.  They "used the same showers and ate in the same mess hall as the other inmates."  Id.  Several of the transferred inmates tested positive or displayed symptoms soon after arrival.  Id. ¶ 35; cf. id. ¶ 50 (stating that testing did not occur until they had already been housed in San Quentin for six days).

On June 1, 2020, upon learning of the transfer, Marin County Public Health (MCPH) Officer Dr. Matthew Willis immediately recommended to Defendants, including Acting Warden Broomfield, that transferred inmates be sequestered from the native San Quentin population, that all exposed inmates be required to wear masks, and that staff

4

movement be restricted between different housing units.  Id. ¶ 38.  Defendants did not adopt any of these policies.  Id.

As noted, at the time of the transfer on May 30, San Quentin had no reported cases. Id. ¶ 34.  Within days, 25 of the transferred inmates tested positive for COVID-19.  Id. ¶ 35.  "Over three weeks, the prison went from having no cases to 499 confirmed cases."  Id. At the time, testing delays in San Quentin were 5-6 days.  Id. ¶ 39.  Both the Innovating Genomics Institute at Berkeley and a research laboratory with the UCSF Medical Center offered to provide free COVID-19 testing for San Quentin, but Defendants rejected the officer.  Id. ¶ 42.

On June 13, a group of health experts toured San Quentin at the request of the federal court-appointed medical monitor and CCHCS Director Clark Kelso.  Id. ¶ 39.  On June 15, the experts circulated an "Urgent Memo" warning that the outbreak could develop into a "full-blown local epidemic and health care crisis in the prison and surrounding communities," and that the overcrowding and other factors created high risk for a "catastrophic super-spreader event."  Id.

By July 7, 2020, more than 1,300 inmates and 184 staff members had tested positive.  Id. ¶ 44.  The number of infected inmates had increased to 2,181 by July 30.  Id. By September 2, twenty-six inmates had died.  Id.

California State Senators have called the inmate transfer a "fiasco, "abhorrent," and "completely avoidable," and a California Assembly member called it the "worst prison health screw up in state history."  Id. ¶ 43.  CDCR Medical Director Dr. Tharratt was removed from his position.  Id.  Secretary Diaz announced his retirement in August.  Id. ¶ 46.  A California Court of Appeal later found that the outbreak was the "worst epidemiological disaster in California correctional history" and that the San Quentin Warden and CDCR "acted with deliberate indifference" to the rights and safety of San Quentin prisoners.  Id. ¶ 47 (quoting In re Von Staich, 56 Cal. App. 5th 53 (2020)). California's OIG released a three-report series assessing CDCR's policies, guidance, and directives regarding COVID-19.  See id. ¶ 48-50.  Cal-OSHA cited the CDCR and San

Quentin with 14 violations, including five groups of violations that were "Serious" and four that were "willful-serious." Id. ¶ 52.

### C.   Polanco's Infection

As of June 2020, Polanco had "multiple high-risk factors for COVID-19," including obesity, diabetes, hypertension, diabetic nephropathy, hyperlipidemia, thrombocytopenia, and age (he was 55). Id. ¶ 53. His obesity was "obvious." Id. San Quentin knew of another disability too: in 2008, Polanco had been "laid off due to a gout-related foot injury": he had difficulty using the stairs, and officials had "refused to accommodate his disability." Id. ¶ 54. In 2013, he "won on appeal" and returned to work. Id.

When San Quentin faced staffing shortages during the pandemic—in part because corrections officers "call[ed] in sick" or "out of fear"—Polanco "work[ed] additional hours, double shifts, and often [came] home to San Jose to sleep for a scant few hours before making the trip back up." Id. ¶ 55. He "worked as the Active Lieutenant on Duty," for which the San Quentin and CDCR Defendants required him "to transport sick inmates in need of care, including inmates sick with COVID-19, to local hospitals and refused to provide employees or inmates with appropriately sanitized vehicles and equipment, or with legally required N-95 respirators or other PPE, even though appropriate PPE was available to Defendants." Id. ¶ 56. Prison staff, including Gilbert Polanco, "were pleading for proper personal protective equipment." Id. ¶ 42. But they were told that "to the extent San Quentin had such PPE, it was reserved for medical professionals and not front-line correctional officers and supervisors." Id. Correctional officers were relegated to wearing inmate-made masks or masks sewn at home by loved ones. Id.

Polanco became infected with COVID-19 around June 21, 2020. Id. ¶ 58. On June 26, he began experiencing symptoms, including a severe cough, shortness of breath, and chest pain. Id. On June 28, he had a drive-thru test and was informed on June 30 that it came back positive. Id. Plaintiffs Patricia and Selena Polanco also each became "severely ill." Id. By July 3, Polanco's condition had worsened, and he was admitted to Kaiser Permanente San Jose Medical Center. Id. ¶ 59. Polanco "fought a hard, up-and-down

battle for over one month, several times defying doctors' expectations that he was close to passing." Id.  Plaintiffs were restricted to short Facetime virtual visits, and even those were limited, as Polanco struggle to breathe and to talk.  Id.  On August 9, he died of complications caused by COVID-19.  Id. ¶ 60.  Of the five San Quentin corrections officers that required hospitalization, he was the only not to make it through alive.  Id.

### D.   Procedural History

On August 24, 2021, Plaintiffs filed this action in federal district court.  See generally Compl.  On December 2, Defendants moved to dismiss.  See Mot. (dkt. 22); Opp. (dkt. 28); Reply (dkt. 31).

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either "a cognizable legal theory" or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court has

1    discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the

2    part of the movant, repeated failure to cure deficiencies by amendment previously allowed,

3    undue prejudice to the opposing party by virtue of allowance of the amendment, [and]

4    futility of amendment."  Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir.

5    2008).

6    **III.    DISCUSSION**

7           Plaintiffs raise Section 1983 claims against the CDCR/San Quentin Defendants and

8    CIM Defendants on both direct and supervisory liability theories, and a Rehabilitation Act

9    claim against the Institutional Defendants.  Of these, the Court dismisses only the Section

10   1983 claim as to the CIM Defendants.  Plaintiffs also raise state claims under the Bane Act

11   and negligent infliction of emotional distress (NIED).  The Court dismisses both claims

12   because Plaintiffs fail to plead the required elements.

13          **A.    Judicial Notice**

14          As a preliminary issue, Defendants request judicial notice and/or incorporation by

15   reference as to: case management statements from May and June 2020 in Plata v. Newsom,

16   No. 4:10-cv-01351-JST, a longstanding case overseeing CDCR's provision of healthcare,

17   RJN (dkt. 23) Ex A-D; an order in another CDCR deliberate indifference case asking for

18   further briefing on qualified immunity in light of Plata, Ex E; testimony by CCHCS

19   Director Kelso before the California State Senate, Ex F; early guidance documents from

20   the CDC on coronavirus, Ex G-I; and declarations by the Department of Health and

21   Human Services (HHS) relating to the Public Readiness and Emergency Preparedness

22   (PREP) Act, Ex J-K.  Plaintiffs object to Exhibits A-I.  Objection (dkt. 29).

23          Courts may judicially notice an adjudicative fact that is "not subject to reasonable

24   dispute" if it is "generally known," or "can be accurately and readily determined from

25   sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)–(2).

26   But "[j]ust because the document itself is susceptible to judicial notice does not mean that

27   every assertion of fact within that document is judicially noticeable for its truth," and "a

28   court cannot take judicial notice of disputed facts contained in [matters of] public

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1  record[]." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018).  Thus,

2  a court must consider what facts are being proposed—i.e., "the purpose for which [the

3  document is] offered." Id. at 1000.  And though a document extensively relied upon in

4  Plaintiffs' complaint may be incorporated by reference, "the mere mention of the existence

5  of a document is insufficient to incorporate the contents of a document." Id. at 1002;

6  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  "[I]f the document merely

7  creates a defense to the well-pled allegations in the complaint, then that document did not

8  necessarily form the basis of the complaint." Khoja, 899 F.3d at 1002.

9       The Court finds that the HHS declarations (Ex J-K) are judicially noticeable

10  because they are in the Federal Register. See 44 U.S.C. § 1507; Fed. R. Evid. 201.  But

11  the Court agrees with Plaintiffs that none of the other documents may be judicially noticed

12  or incorporated by reference.  Defendants appear to want this Court to take as true factual

13  representations made in the Plata case management statements in Ex A-D and to draw

14  related inferences, but the Court cannot do so because they go to the heart of the Plaintiffs'

15  allegations. Khoja, 899 F.3d at 999.  The other documents are not sufficiently relevant to

16  this motion to be judicially noticed, and cannot be incorporated by reference because

17  Plaintiffs do not extensively rely on them (and in some cases do not even mention them).

18  See id. at 1002.

19       **B.     The PREP Act**

20       Defendants first argue that they are immune to all claims under the PREP Act.  This

21  argument fails.

22       The PREP Act provides immunity for injuries "caused by, arising out of, relating to,

23  or resulting from the administration to or the use by an individual of a covered

24  countermeasure if a declaration [by the HHS Secretary] has been issued with respect to

25  such countermeasure." 42 U.S.C. § 247d-6d(a)(1).  Under the statute, covered

26  countermeasures include "qualified pandemic . . . product[s]" and "respiratory protective

27  device[s] . . . that the Secretary determines to be a priority for use." 42 U.S.C. § 247d-

28  6d(i)(1)(A), (C), (D).

The Secretary issued a declaration in light of COVID-19.  Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,198, 15,198 (Mar. 17, 2020).  It has been amended several times during the pandemic.  A "covered countermeasure" may include "any antiviral, any other drug, any biologic, any diagnostic, any other device, any respiratory protective device, or any vaccine, used . . . to treat, diagnose, cure, prevent, mitigate or limit the harm from COVID-19."  Fourth Amendment to the Declaration, 85 Fed. Reg. 79,190, 79,196 (Dec. 9, 2020).  The Secretary has also declared that <u>failure</u> to institute a covered countermeasure may sometimes give rise to immunity:

> Where there are limited Covered Countermeasures, not administering a Covered Countermeasure to one individual in order to administer it to another individual can constitute "relating to . . . the administration to . . . an individual" under 42 U.S.C. 247d-6d.  For example, consider a situation where there is only one dose of a COVID-19 vaccine, and a person in a vulnerable population and a person in a less vulnerable population both request it from a healthcare professional. In that situation, the healthcare professional administers the one dose to the person who is more vulnerable to COVID-19. In that circumstance, the failure to administer the COVID-19 vaccine to the person in a less-vulnerable population "relat[es] to . . . the administration to" the person in a vulnerable population. The person in the vulnerable population was able to receive the vaccine only because it was not administered to the person in the less-vulnerable population.

<u>Id.</u> at 79,197.  Thus, courts have concluded that immunity for "inaction claims" only lies when the defendant's failure to administer a covered countermeasure to one individual has "a close causal relationship" to the administration of that covered countermeasure to another individual.  <u>Lyons v. Cucumber Holdings, LLC</u>, 520 F. Supp. 3d 1277, 1285–86 (C.D. Cal. 2021) (citation omitted).

As pleaded, Defendants' alleged failures to administer covered countermeasures to Polanco do not bear a "close causal relationship" to their administration of covered countermeasures to some other individual.  And many of the allegedly tortious acts described in the complaint do not relate to a covered countermeasure at all.  The Court therefore cannot conclude that any of the Defendants have immunity under the PREP Act.  The vast majority of other courts to confront similar arguments have reached the same

conclusion.  See, e.g., Dupervil v. All. Health Operations, LCC, 516 F. Supp. 3d 238, 255 (E.D.N.Y. 2021) (PREP Act does not immunize a nursing home for its alleged failure to take steps "such as separating residents [and] enforcing social distancing among residents and staff"); Smith v. Colonial Care Ctr., Inc., 2021 WL 1087284, at *4 (C.D. Cal. Mar. 19, 2021) (PREP Act does not provide immunity where a complaint mainly concerns the defendant's "policies and a failure to protect, not [] any covered countermeasure"); Padilla v. Brookfield Healthcare Ctr., 2021 WL 1549689, at *5 (C.D. Cal. Apr. 19, 2021) (similar).

### C.    Qualified Immunity

"Qualified immunity protects government officers from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Hernandez v. City of San Jose, 897 F.3d 1125, 1132 (9th Cir. 2018) (quotation and citation omitted).  "To determine whether an officer is entitled to qualified immunity, [courts] ask, in the order [they] choose, (1) whether the alleged misconduct violated a right and (2) whether the right was clearly established at the time of the alleged misconduct."  Maxwell v. Cty. of San Diego, 708 F.3d 1075, 1082 (9th Cir. 2013) (citing Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)).

If there was a violation, the "salient question" is whether the law at the time gave the defendants "fair warning" that their conduct was unconstitutional.  Tolan v. Cotton, 572 U.S. 650, 656 (2014).  Courts should not define clearly established law "at a high level of generality."  Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (citation omitted).  On the other hand, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."  Taylor v. Riojas, 141 S. Ct. 52, 53-54 (2020) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)); accord White v. Pauly, 137 S. Ct. 548, 551 (2017).

In analyzing Plaintiffs' Section 1983 claims, the Court first considers whether Plaintiffs have pleaded constitutional violations against each group of Defendants and then

United States District Court
Northern District of California

asks whether that law was clearly established.

### 1. Due Process

Section 1983 creates a cause of action against a "person who, under color of any [state law], subjects, or causes to be subjected, any [person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A plaintiff must allege facts from which it may be inferred that: (1) he was deprived of a federal right; and (2) the person who committed the alleged violation acted under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). A Section 1983 claim may be brought only by the person whose rights were violated—or, if that person is deceased, by a representative authorized by state law as to survival actions. 42 U.S.C. § 1988; Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 369 (9th Cir. 1998); see Cal. Civ. Proc. Code § 377.30 (authorizing successors-in-interest to bring survival actions).

The Fourteenth Amendment prohibits a state from depriving a person of "life, liberty or property, without due process of law." U.S. Const. amend. XIV. But the Constitution does not confer a general affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989). The "general rule" is that a state actor is not liable under the Due Process Clause "for its omissions." Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1086 (9th Cir. 2000). Yet a state actor's failure to protect "may give rise to a § 1983 claim under the state-created danger exception 'when the state [actor] affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger.'" Herrera v. Los Angeles Unified Sch. Dist., 18 F.4th 1156, 1158 (9th Cir. 2021) (quoting Patel v. Kent Sch. Dist., 648 F.3d 965, 971–72 (9th Cir. 2011)). The state-created danger doctrine holds state actors liable "for their roles in creating or exposing individuals to danger they otherwise would not have faced." Pauluk v. Savage, 836 F.3d 1117, 1122 (9th Cir. 2016) (citing Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir. 2006)).

The Ninth Circuit long ago found that a state actor may be liable for a state-created

12

danger in a workplace setting.  See L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir. 1992)

(Grubbs I) (defendants were plausibly liable where they required a female nurse to be

alone with a young man with a history of sexually assaulting women, without any sort of

warning).  More recently, it has explained that such a claim must satisfy two prongs:

> First, a plaintiff must show that the state engaged in "affirmative conduct" that placed him or her in danger.  This "affirmative conduct" requirement has several components.  A plaintiff must show not only that the defendant acted "affirmatively," but also that the affirmative conduct placed him in a "worse position than that in which he would have been had [the state] not acted at all."  The affirmative act must have exposed the plaintiff to "an actual, particularized danger," and the resulting harm must have been foreseeable.  Second, the state actor must have acted with "deliberate indifference" to a "known or obvious danger."  "Deliberate indifference" requires a "culpable mental state" more than "gross negligence."

Pauluk, 836 F.3d at 1124–25 (citations omitted).  The Ninth Circuit recently reaffirmed

that, in failure-to-protect claims that arise outside of detention settings, the deliberate

indifference test is a "purely subjective" one.  Herrera, 18 F.4th at 1161.[1]

The analysis in Pauluk is instructive.  Daniel Pauluk, an environmental health

specialist for a county health district, was transferred – over his strong objection – to a

facility where he had previously been stationed and that had a known "proliferation of

toxic mold."  836 F.3d at 1119.  For that reason, Pauluk asked his superiors to be

transferred away, but the requests were denied.  Id.  He began to experience serious

symptoms that multiple doctors later testified were the result of "toxic mold exposure."  Id.

at 1119-20.  His poor health led to his departure from his job two years later and his death

from "mixed mold mycotoxicosis."  Id. at 1120.  In a Section 1983 case brought by

Pauluk's successors-in-interest against his superiors, the district court denied the

defendants' motion for summary judgment, holding that a jury could find that they failed

to protect him from a state-created danger in the workplace.

---

[1] In their opposition, Plaintiffs state that they agree with the Herrera panel that "an objective deliberate indifference standard should apply to Sergeant Polanco's state-created danger claims." Opp. at 11-12 n.8.  Yet although Herrera muses that, "[a]bsent our precedent," "we may have been inclined to" employ the objective test, it plainly holds that the correct test is a subjective one, and this Court is of course bound by that decision.  18 F.4th at 1160-61.

United States District Court
Northern District of California

On appeal, the <u>Pauluk</u> court agreed that, viewed in the light most favorable to the plaintiffs, the defendants had violated the Due Process Clause by failing to protect Pauluk from a state-created danger.  First, there was sufficient evidence to conclude that, in transferring Pauluk, they engaged in "affirmative" conduct that placed him in a "worse position" and that the harm was foreseeable.  <u>Id.</u> at 1125.  Second, it held that they acted with deliberate indifference because they were aware of the "pervasive mold problems," were "on notice of the potential health problems associated" with them, and some evidence indicated they "actively tried to conceal the amount of, and danger posed by, the mold." <u>Id.</u>  Nevertheless, the court granted the defendants qualified immunity: although <u>Grubbs I</u> had "clearly established" that the state-created danger doctrine applied in the workplace where a "human actor [] posed a known threat," it had not "clearly established" that the doctrine could apply where the danger was a "physical condition in the workplace."  <u>Id.</u> at 1126.

Plaintiffs also argue that the Individual Defendants are liable under a supervisory theory.  A supervisor is only liable under Section 1983 for violations of subordinates "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation."  <u>Lemire v. California Dep't of Corr. & Rehab.</u>, 726 F.3d 1062, 1074-75 (9th Cir. 2013) (quoting <u>Lolli v. Cnty. of Orange</u>, 351 F.3d 410, 418 (9th Cir. 2003)).  "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury."  <u>Starr v. Baca</u>, 652 F.3d 1202, 1207–08 (9th Cir. 2011) (citations omitted) (cleaned up).  A supervisor can be liable "for own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."  <u>Id.</u> at 1208 (quoting <u>Watkins v. City of Oakland</u>, 145 F.3d 1087, 1093 (9th Cir. 1998)).

### a.        CDCR/San Quentin Defendants

The Court finds that Plaintiffs have pleaded a Section 1983 claim against the CDCR/San Quentin Defendants (Diaz, Estate of Dr. Tharratt, Davis, Broomfield, Cryer, Dr. Pachynski, and Dr. Garrigan).

First, Plaintiffs have sufficiently pleaded that Secretary Diaz and Dr. Tharratt, top officials at CDCR, were deliberately indifferent to the state-created COVID-19 outbreak at San Quentin. Plaintiffs allege that Secretary Diaz is the "highest policymaking official" of CDCR and was "personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020." See Compl. ¶ 9. Dr. Tharratt "was the Medical Director and a policymaking official of CDCR who . . . was responsible for medical-related oversight" and was similarly "personally involved" in that same decision. Id. ¶ 10. Diaz and Dr. Tharratt may not have been "personally involved" in subsequent decisions as to exactly how the inmates were housed once they arrived at San Quentin. But Plaintiffs plausibly allege that the decision to transfer inmates was (1) affirmative conduct that placed Polanco in "actual, particularized danger" that led to the foreseeable harm; and (2) that they were deliberately indifferent to a "known or obvious danger" to Polanco and other San Quentin guards similarly situated. See Pauluk, 836 F.3d at 1124–25. (Although the Plaintiffs do not allege that Diaz and Dr. Tharratt knew of a risk specific to Polanco, they adequately allege that they knew of the obvious risk to guards at San Quentin.) The plausibility of this claim is further bolstered by the allegation that many other actors—from state courts to state legislators to state agencies—have ascribed deliberate indifference (or something close) to the CDCR and its leaders with respect to the inmate transfer. See generally Compl. ¶ 43-52.

In their reply brief, Defendants present a new argument that they insist originates in Pauluk: that a state-created workplace danger must be caused by affirmative conduct that "increased workplace danger to that particular employee." Reply at 1. "Polanco fails to articulate how he faced a known, heightened danger compared to other custody staff at the prison, all of whom were at the front lines during the early days of the pandemic." Id. The

Court need not consider arguments not in the initial brief.  But in any case, the Court does not read <u>Pauluk</u> or any other case to require that.  To be sure, affirmative state conduct that puts employees at risk of hypothetical and generalized dangers does not violate the Due Process Clause.  Postal employees face a known risk of harm in a vehicle collision while delivering mail, but that is not a sufficiently "actual" or "particularized" danger because all who drive vehicles face this danger.  No cited case states that the "particularized danger" requirement requires that the danger be unique to one employee vis-à-vis another.  The toxic mold in <u>Pauluk</u> was not uniquely toxic to Pauluk.[2]  Defendants here were plausibly deliberately indifferent to the higher risk posed to Polanco and those similarly situated.

Plaintiffs have also pleaded that Diaz and Estate of Dr. Tharratt are liable on a supervisory theory because they "set[] in motion a series of acts by others"—including officials at both San Quentin and CIM—and/or "knowingly refus[ed] to terminate a series of acts by others, which [they] knew or reasonably should have known would cause others to inflict a constitutional injury."  <u>Starr</u>, 652 F.3d at 1207–08.  In setting in motion the acts by their underlings that led to the increased danger to Polanco, the decision to undertake the inmate transfer was "a sufficient causal connection [] between the supervisor's unlawful conduct and the constitutional violation."  <u>See</u> <u>Lemire</u>, 726 F.3d at 1074-75.

Plaintiffs have also plausibly alleged that Warden Davis and Acting Warden Broomfield of San Quentin were deliberately indifferent to the danger posed by the COVID-19 outbreak.  Plaintiffs plead that Davis "was the highest policymaking official of San Quentin, responsible for the oversight, management, hiring, decisions, policies, procedures, provision of services, and supervision of all employees and agents of San Quentin."  Compl. ¶ 11.  They allege that "he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that was done, the manner and location of housing assignments for inmates at San Quentin" and that he was

---

[2] It may well be that Pauluk had preexisting conditions that put him at higher risk of mold-related disease than other employees, but it does not follow that other employees harmed by the mold lacked claims, if they were put in harm's way by deliberately indifferent superiors.

United States District Court
Northern District of California

responsible for "requiring [corrections officers] to work and putting them at high risk for contracting COVID-19 without proper or adequate training, safety or disease, and without legally required protection."  Id.  Acting Warden Broomfield was also in charge of the prison for some of the relevant events (Plaintiffs do not allege the precise dates of his tenure as Acting Warden).  Id. ¶ 12.  Even if Davis and Broomfield were not involved in all decisions, they were involved with those made after the infected inmates arrived in San Quentin.  Broomfield and other Defendants were on the June 1 conference call in which the county public health officer explained the grave risks and recommended practices such as quarantines, mask-wearing, and restricting staff movement between different housing units.  Compl. ¶ 38.  Nonetheless, Davis and Broomfield chose not to pursue any of these policies.  See id. ¶ 35 (inmates were housed in "open-air cells open into a shared atrium" and they "used the same showers and ate in the same mess hall as the other inmates").  Davis and Broomfield therefore engaged in various instances of "affirmative conduct" that exposed Polanco and similarly-situated guards to an "actual, particularized danger" that was "foreseeable" in light of common knowledge from state authorities as to the COVID-19 risks at that time.  See Pauluk, 836 F.3d at 1124–25.  Plaintiffs also sufficiently allege that Davis and Broomfield were deliberately indifferent.  See id.

The Court also finds that Plaintiffs plausibly allege supervisory liability for Davis and Broomfield insofar as they failed to control their subordinates who made some of the above decisions and/or acquiesced in the constitutional deprivation.  See Starr, 652 F.3d at 1208; Compl. ¶ 42 (prison staff, including Polanco, were "pleading" for PPE but it was denied them); see, e.g., id. ¶ 76(i) (alleging that Defendants "refuse[d] to train inmates and prison staff about public health and proper precautions to protect themselves and prevent the spread of COVID-19 at San Quentin"); id. ¶ 77 (similar).

Plaintiffs have also plausibly alleged that Cryer, Dr. Pachynski, and Dr. Garrigan were deliberately indifferent to the danger to Polanco from San Quentin's COVID-19 outbreak.  Cryer is the CEO of Health Care for San Quentin and was "a policy-making official concerning medical care and health" who "served as a principal advisor in

17

institution-specific application of health care policies and procedures." Compl. ¶ 13. They allege that he was "responsible for: planning, organizing, and coordinating the implementation of the health care delivery system at San Quentin; [and] supervising health care program managers responsible for administrative services within healthcare." Id. Dr. Pachynski was "Chief Medical Executive of San Quentin," "a policy-making official concerning medical care and health" who was "responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at San Quentin." Id. ¶ 14. Dr. Pachynski received the letter on March 18, 2020 from public defenders requesting PPE, cleaning supplies, and social distancing procedures for inmates and staff, but neither she nor other Defendants took action then or later. See id. ¶ 30. As "Chief Physician and Surgeon of San Quentin," Dr. Garrigan was also a "policy-making official . . . responsible for" many of the same issues as Dr. Pachynski. Id. ¶ 15.

Plaintiffs do not precisely plead the scope of the duties of these medical officials. Some decisions were likely beyond the scope of their duties. For example, these medical officials were presumably not responsible for the initial decision to transfer the inmates from CIM to San Quentin, the lack of testing before they got on the buses in CIM, or the crowded conditions on the buses. However, many decisions at San Quentin—including the failure to test or quarantine infected inmates and the failure to provide adequate PPE to corrections officers—plausibly were made by Cryer, Dr. Pachynski, and/or Dr. Garrigan. Plaintiffs allege that the Innovative Genomics Institute and UCSF volunteered to provide free testing, but the San Quentin Defendants (likely including these medical officials) refused. Id. ¶ 42. As such, Plaintiffs plausibly allege that they engaged in multiple instances of "affirmative conduct" that exposed Polanco to an "actual, particularized danger" that was "foreseeable" in light of their knowledge of the obvious COVID-19 risks at that time. See Pauluk, 836 F.3d at 1124–25. Even if these officials did not know of the risk to Polanco, they surely knew of the risk to San Quentin guards in his position (and who have various comorbidities). Further, to the extent that some of these actions were

not directly taken by these officials, Plaintiffs plausibly allege a "requisite causal connection" by "setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others."  See Starr, 652 F.3d at 1207–08; see, e.g., Compl. ¶ 42 (prison staff were "pleading" for PPE but it was denied them).

At least at this stage of litigation, the Court concludes that Plaintiffs have plausibly alleged that the CDCR/San Quentin Defendants, both on their own behalf and on a supervisory theory, violated the Due Process Clause by failing to protect Polanco from the state-created danger of a COVID-19 outbreak at San Quentin.

### b.    CIM Defendants

However, the Court concludes that Plaintiffs do not plausibly allege that the CIM Defendants (Escobell, Dr. Farooq, and Dr. Torres) violated the Due Process Clause.

Plaintiffs allege that Louie Escobell, R.N., was the "Chief Executive Officer for Health Care" of CIM and therefore the "policy-making official concerning medical care and health at CIM" and was therefore "personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done."  Id. ¶ 16.  Dr. Farooq was the "Chief Medical Executive of CIM," about whom Plaintiffs make similar allegations.  See id. ¶ 17.  Plaintiffs also make similar allegations about Dr. Torres, the "Chief Physician and Surgeon of CIM."  Id. ¶ 18.  While there are relatively few specific allegations as to exactly who made various decisions, the complaint cites a report by the California OIG that found that "a [CIM] health care executive explicitly ordered that the incarcerated persons not be retested the day before the transfers began."  Id. ¶ 50.

As Defendants note, the defendants in Pauluk and Grubbs "intentionally directed employees into dangerous job conditions knowing the danger entailed."  Reply at 4.  In contrast, the CIM Defendants "worked at a separate prison and took no action directing Polanco's work assignments."  Id.  In response to this argument, Plaintiffs go up the ladder of abstraction.  They argue that the CIM Defendants satisfy Pauluk because (1) they engaged in "affirmative conduct" that endangered Polanco—packing inmates onto a

19

1   crowded bus without testing them—that caused foreseeable, actual, and particularized

2   harm of the expected type, and (2) they were deliberately indifferent to Polanco and other

3   corrections officers similarly situated.  Yet the facts remain an uneasy fit.  Unlike the

4   CDCR/San Quentin Defendants, the CIM Defendants were not Polanco's superiors, not at

5   San Quentin, and/or had little to do with him.  Although Plaintiffs allege that the CIM

6   Defendants were aware that the manner of transfer might endanger people, it is difficult to

7   infer that they had knowledge of any danger particularized to Polanco.

8        Relatedly, although this issue was not briefed, proximate causation appears tenuous.

9   CIM Defendants may have taken affirmative (and deliberately indifferent) actions in the

10  manner of the transfer—e.g., crowding them on buses without masks and without testing

11  them—and that was likely to put San Quentin guards in a worse position and that led to

12  harm.  But the manner of transfer has a somewhat attenuated causal relationship to the

13  harm to Polanco.  First, Plaintiffs make only a conclusory allegation that CIM Defendants

14  (who make decisions <u>at CIM</u>, not all of CDCR) were responsible for the actual decision to

15  initiate the inmate transfer.  (Even supposing that they lobbied to transfer inmates out of

16  CIM, it presumably was not their decision to send them <u>to San Quentin</u>).  Thus, even if the

17  CIM Defendants are responsible for the manner of transfer, they do not have responsibility

18  for the decision to transfer to San Quentin, so it is difficult to ascribe the entire chain of

19  events to them.  Second, several weeks of actions by the CDCR/San Quentin Defendants

20  occurred between CIM Defendants' actions (on May 30) and Polanco's infection (June

21  21).  Compl. ¶¶ 34, 58.  These actions seem analogous to "intervening causes."  While

22  injury of guards at the other prison was a plausible result of mismanaging the transfer, it is

23  less foreseeable in light of the more limited scope of the CIM Defendants' duties (i.e., to

24  inmates and guards in CIM, but not to Polanco) and in light of weeks of subsequent events

25  that weaken the chain of causation.

26        Ultimately, the Court cannot conclude that the relatively conclusory allegations

27  about the CIM Defendants' decisions at a prison in Southern California—even if reckless

28  or shocking—plausibly make them liable for failing to protect a corrections officer at a

United States District Court
Northern District of California

1    prison in Northern California.  The Court therefore concludes that Plaintiffs have failed to

2    plead sufficient "factual content [to] allow[] the court to draw the reasonable inference that

3    the [CIM Defendants are] liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678.[3]

### c.    Individual Capacity Claims

5        In addition to bringing Section 1983 claims in their capacity as Polanco's

6    successors-in-interest, Plaintiffs bring claims in their individual capacities as Polanco's

7    children.  A plaintiff's "interest in her relationship with a parent is sufficiently weighty by

8    itself to constitute a cognizable liberty interest" under the Fourteenth Amendment.

9    Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991).

10        A governmental officer's behavior violates substantive due process only when it is

11   "so egregious, so outrageous, that it may fairly be said to shock the contemporary

12   conscience."  Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998) (citation and

13   quotation omitted).  Where "actual deliberation is practical," action taken with deliberate

14   indifference may shock the conscience.  Id. at 851; Wilkinson v. Torres, 610 F.3d 546, 554

15   (9th Cir. 2010).  But where decisions must be made "in haste, under pressure, and

16   frequently without the luxury of a second chance"—as in a prison riot or a high-speed

17   police chase—an official must have "purpose to cause harm."  Lewis, 523 U.S. at 853,

18   854; accord Wilkinson, 610 F.3d at 554 (purpose to harm is necessary when an official

19   makes a "snap judgment" because of an escalating situation).

20        While the COVID-19 pandemic was of course an "emergency," see Opp. at 16,

21   Compl. ¶ 28 (Governor Newsom's emergency declaration), that does not mean "actual

22   deliberation [was not] practical."  There is no allegation in the complaint that there was

---

[3] The Court notes, however, that the CDCR Defendants (Diaz and Estate of Dr. Tharratt) may be liable for the actions of the CIM Defendants on a supervisory theory.  That is, even if the medical officials at CIM did not owe a duty to guards at San Quentin, and even if the chain of causation is broken by intervening events, the same is not true of the CDCR Defendants, whose duties presumably did stretch to San Quentin guards and who may bear responsibility for those intervening events because of the CDCR Defendants' role in initiating and overseeing the transfer.  See Starr, 652 F.3d at 1207–08 (noting that the "requisite causal connection" for supervisory liability "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury").

United States District Court
Northern District of California

some exigent reason that the CDCR/San Quentin Defendants <u>had</u> to immediately make the decision to transfer CIM inmates to San Quentin on May 30, 2020, particularly after 60 days of no inmate transfers.  Compl. ¶ 32.  Nor were the CDCR/San Quentin Defendants precluded from "actual deliberation" as to whether to pack infected inmates on crowded buses without masks and then immediately house them in a crowded open-air prison.  On the facts pleaded, the CDCR/San Quentin Defendants had sufficient time to deliberate before making these decisions.  (And some non-defendants did in fact deliberate: nurses at CIM questioned the packing of untested inmates on buses, asking in emails: "What about Patient [sic] safety? What about COVID precautions?"  Compl. ¶ 51.)

Because it was "practical" for CDCR/San Quentin Defendants to deliberate, deliberate indifference is the appropriate intent standard to determine whether their action "shocks the conscience" and violated Plaintiffs' individual due process rights.  For the reasons described above, the Court concludes that Plaintiffs have plausibly alleged that the CDCR/San Quentin Defendants acted with deliberate indifference and violated their individual constitutional rights.  (Plaintiffs' personal constitutional claims against the CIM Defendants fail for the same reason that their claims as successors-in-interest fail.)

### 2.    Clearly Established Law

Having concluded that the CDCR/San Quentin Defendants violated Polanco's and Plaintiff's constitutional rights, the Court now turns to whether these rights were "clearly established at the time of the alleged misconduct."  <u>Maxwell</u>, 708 F.3d at 1082.  As noted, there need not be a case precisely on point, as "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."  <u>Taylor</u>, 141 S. Ct. at 53-54.  Though a court must not define a right at a high level of generality, see <u>Kisela</u>, 138 S. Ct. at 1152, an official's "legal duty need not be litigated and then established disease by disease or injury by injury," <u>Est. of Clark v. Walker</u>, 865 F.3d 544, 553 (7th Cir. 2017); cf. <u>Maney v. Brown</u>, 2020 WL 7364977, at *6 (D. Or. Dec. 15, 2020) (denying qualified immunity to prison officials because inmates had "a clearly established constitutional right to protection from a heightened exposure to

22

COVID-19, despite the novelty of the virus").

Cases in this circuit over more than three decades have established that a state actor may violate the Due Process Clause for failing to protect a person from a state-created danger. See, e.g., Kennedy, 439 F.3d at 1062; Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989). And it is well-established that this doctrine applies to state employees who work in a prison. See Grubbs I, 974 F.2d at 121 (state plausibly failed to protect a nurse from sexual assault at a medium-security custodial institution); see also L.W. v. Grubbs, 93 F.3d 894, 900 (9th Cir. 1996) (Grubbs II) (reiterating the deliberate indifference standard in that context). It is also well-established that this doctrine applies in workplace settings where the threat comes not from a dangerous person but from a physical condition in the workplace that causes disease. See Pauluk, 836 F.3d at 1126. These cases, all of which predate the events at issue here, gave the CDCR/San Quentin Defendants "fair warning" that it violates the Constitution to (1) engage in "affirmative conduct" that exposes an employee to a "foreseeable," "actual, [and] particularized danger" from disease, while (2) being "deliberately indifferent" to that danger. See id. As currently pleaded, this general rule applied "with obvious clarity" to the CDCR/San Quentin Defendants' decision to transfer 122 inmates from a prison afflicted by a disease outbreak (that had infected 600 and killed nine) in crowded buses to open-air conditions in another prison among thousands of uninfected inmates and guards. Compl. ¶¶ 32-34.

Arguing to the contrary, CDCR/San Quentin Defendants repeatedly remind the Court that the COVID-19 pandemic was "novel" and "unprecedented" and that "the law was not clearly established regarding prison employee rights in the context of managing an inmate health crisis." See, e.g., Reply at 7. They also contend that best practices at the time were unclear. See Opp. at 14 (noting that the health inspectors who visited on June 13 argued that quarantining in cells usually used for punishment "may thwart efforts for outbreak containment" but that Plaintiffs alleged that placing inmates in "open-air cells" exacerbated the outbreak (citing Compl. ¶¶ 41, 35)).

While these two statements are not contradictory, CDCR/San Quentin Defendants

are undoubtedly correct that May 2020 was a novel situation.  At a later point, the Court may well conclude that, in light of the undisputed facts, a constitutional violation was not clearly established because (for example) Defendants made their decisions in the attempt to comply with other guidance or law.  See Fed. R. Civ. P. 56.  The Court may conclude that the case law did not clearly establish any duty in the unique context of some of the facts.  Or the Court may conclude that, after CDCR officials made the decision to transfer the infected inmates, certain of the San Quentin Defendants were not able to comply with the clearly established requirements in the case law.  The Defendants' request for judicial notice appears to be an attempt to adduce facts outside the complaint necessary to make these and similar arguments.[4]  But as noted above, the Court cannot consider any of this material at this stage in the litigation.

For the purposes of this motion, the Plaintiffs have pleaded violations of clearly established law.  The CDCR/San Quentin Defendants plausibly had "fair warning" that deliberate indifference to the safety of San Quentin corrections officers such as Polanco was unconstitutional.  See Tolan, 572 U.S. at 656.  The Court therefore declines to dismiss the Section 1983 claims against the CDCR/San Quentin Defendants.

### D.    Rehabilitation Act

Plaintiffs next argue that California, CDCR, and San Quentin violated the Rehabilitation Act by not providing Polanco with reasonable accommodation for his disabilities.  The Court holds that Plaintiffs plausibly pleaded this claim.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

---

[4] In requesting judicial notice as to materials in Plata, the Defendants seem to be gesturing at this argument—that they undertook the inmate transfer in part because they reasonably thought that they should do so, based on the progress of other litigation.  See RJN Ex A-D.  The inclusion of various seemingly contradictory CDC guidelines appears to be intended to do the same.  See RJN Ex G-I.  These documents are not properly before the Court at this time.  See Khoja, 899 F.3d at 999.

United States District Court
Northern District of California

discrimination under any program." 29 U.S.C. § 794(a).  Under the Rehabilitation Act, institutional defendants are liable for the vicarious acts of their employees.  <u>Duvall v. Cty. of Kitsap</u>, 260 F.3d 1124, 1141 (9th Cir. 2001).

"The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act (ADA)."  <u>Coons v. Sec'y of U.S. Dep't of Treasury</u>, 383 F.3d 879, 884 (9th Cir. 2004) (quoting 29 U.S.C. § 794(d)); <u>see, e.g.</u>, <u>Zukle v. Regents of Univ. of California</u>, 166 F.3d 1041, 1045-47 & n.11 (9th Cir. 1999) (applying reasonable accommodations analysis to a discrimination claim under the Rehabilitation Act).  The Rehabilitation Act therefore incorporates the ADA's requirement that an employer make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).

A plaintiff alleging a failure-to-accommodate discrimination claim under the Rehabilitation Act must show: (1) that he had a disability within the meaning of the Rehabilitation Act; (2) that the employer had notice of his disability; (3) that he could perform the essential functions of his job with a reasonable accommodation; and (4) that the employer refused to provide a reasonable accommodation.  <u>See</u> <u>Samper v. Providence St. Vincent Med. Ctr.</u>, 675 F.3d 1233, 1237 (9th Cir. 2002).  After an employee has shown that he requires an accommodation, the employer engages in an interactive process with the employee to determine an appropriate accommodation.  <u>See</u> <u>Zivkovic v. S. California Edison Co.</u>, 302 F.3d 1080, 1089 (9th Cir. 2002).

To recover monetary damages, a plaintiff "must prove <u>intentional</u> discrimination."  <u>Duvall</u>, 260 F.3d at 1138 (emphasis added).  This higher intent standard is satisfied by deliberate indifference, which in this context "requires both [1] knowledge that a harm to a federally protected right is substantially likely, and [2] a failure to act upon that the likelihood."  <u>Id.</u> at 1139.  The first element is met where the plaintiff "has alerted the public entity to the need for an accommodation (or where the need for accommodation is

obvious, or required by statute or regulation)."  Id.; cf. Ludovico v. Kaiser Permanente, 57 F. Supp. 3d 1176, 1198–99 (N.D. Cal. 2014) ("Implicit in these statutory duties is that the employer actually know of the alleged disability in question.").  The failure-to-act element "must be a result of conduct that is more than negligent, and involves an element of deliberateness."  Duvall, 260 F.3d at 1139.

Plaintiffs satisfy the four threshold requirements.  First, Plaintiffs allege that Polanco had "a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment."  29 U.S.C. § 705(20)(A)(i).  Plaintiffs plead that Polanco had six "physical impairments": obesity, diabetes, hypertension, hyperlipidemia, thrombocytopenia, and diabetic nephropathy.  Compl. ¶ 91.  These impairments plausibly resulted in a "substantial impediment to employment" insofar as they put him at higher risk of contracting COVID-19 and negatively impacting his employment either through illness or death.  Second, Plaintiffs allege that the Institutional Defendants and their delegees had notice of these impairments.  Plaintiffs do not allege that Polanco notified his superiors or asked for an accommodation.  See Opp. at 23.  Yet Defendants knew of his disabilities because his "obesity was obvious," he had submitted Verification of Treatment letters to excuse his medical absences from work, and he previously went through an arbitration proceeding to win his job back after he was laid off in 2008 when San Quentin officials "refused to accommodate his disability" after he had difficulty using the stairs.  Compl. ¶¶ 53-54, 91.  This satisfies the "notice" element.  Third, Plaintiffs allege that he performed the functions of his job well.  See id. ¶ 25 (noting that Polanco was "beloved as [a] corrections officer," that San Quentin inmates "collectively demanded his funeral be live-streamed throughout the prison, and that Governor Newsom ordered the flag be flown at half-staff on the day of Polanco's death), ¶ 55 (noting that he worked additional hours when the prison was short-staffed), ¶ 56 (noting that he worked as the "Active Lieutenant on Duty" and had duties "including transferring sick inmates to local hospitals").  Fourth, Plaintiffs allege that the Defendants "took no steps to protect their own medically vulnerable staff members, including Gilbert Polanco, from exposure to COVID-19" during

the transfer.  Id. ¶ 42.  Defendants provided no accommodation.  Plaintiffs have pleaded the four required elements.

The failure to accommodate Polanco's disabilities also rises to the level of deliberate indifference, although that appears to be a closer question.  While Defendants had knowledge of Polanco's disabilities from prior events, Defendants need to have deliberately considered his disabilities in the timeframe at issue.  A state actor that is deliberately indifferent to the danger of COVID-19 to San Quentin guards such as Polanco may not necessarily exhibit deliberate indifference to the danger of COVID-19 to Polanco's disability as such.  The Court also notes that the Rehabilitation Act has a more stringent causation standard than the ADA and than most civil rights laws: it forbids discrimination "solely by reason of . . . disability."  29 U.S.C. § 794(a); see, e.g., Martin v. California Dep't of Veterans Affs., 560 F.3d 1042, 1049 (9th Cir. 2009) (rejecting the plaintiff's Rehabilitation Act and ADA claims because she "was denied admission because none of the facilities had adequate resources to be able to care for her properly, not because of her disability").

Nonetheless, the Court holds that Plaintiffs have plausibly pleaded that Defendants considered the obvious risks to disabled guards in the process of making the alleged series of decisions at issue here.  They therefore have pleaded deliberate indifference.  The Court denies Defendants' motion to dismiss the Rehabilitation Act claim.

### E.    State Claims

The Court dismisses both of the state claims as insufficiently pleaded.

#### 1.    Statutory Immunity

First, Defendants argue that California statutory provisions bar state-law challenges to discretionary decisions and failures to provision needed equipment or personnel.  At this time, the Court declines to dismiss the claims on these bases.

Under California Government Code § 820.2, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion was abused."  The

California Supreme Court has distinguished between "planning" functions of government, which cannot give rise to liability, and "operational" ones, which can.  Johnson v. State, 69 Cal.2d 782, 794 (1968).  A planning function involves a "basic policy decision," not a merely "ministerial" one to implement a policy already formulated.  Caldwell v. Montoya, 10 Cal. 4th 972, 981 (1995).

Importantly, "an employee's normal job duties are not determinative; the burden rests with government defendants to demonstrate that they are entitled" to immunity.  AE ex rel. Hernandez v. Cty. of Tulare, 666 F.3d 631, 640 (9th Cir. 2012); see Johnson, 69 Cal.2d at 794 n.8 ("[T]o be entitled to immunity[,] the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place.").  Thus, it is an "odd" case in which discretionary act immunity can be found at the motion-to-dismiss phase.  AE, 666 F.3d at 640.

The Court therefore does not dismiss these claims on this basis.  Although some of the CDCR/San Quentin Defendants' decisions may turn out to be "policy" decisions, the state has not made a showing that (1) policy discretion was vested in each of these individual defendants; and (2) each of the defendants' challenged actions resulted from exercise of that policy discretion.  See Cal. Gov't. Code § 820.2.

The Court also declines to dismiss these claims under Government Code § 845.2, which immunizes public entities and employees from liability "for failure to provide [to a prison] sufficient equipment, personnel, or facilities."  This provision ensures that "essentially budgetary decisions . . . [are not] subject to judicial review in tort litigation."  Zelig v. Cty. of Los Angeles, 27 Cal. 4th 1112, 1142 (2002).  Although Plaintiffs allege that Defendants had inadequate equipment and personnel, they do not allege that these decisions were caused by budgetary issues.  As with § 820.2, this argument is premature at this stage in litigation.

### 2.    The Bane Act

Section 52.1 of the Bane Act "provides a cause of action for [1] violations of a plaintiff's state or federal civil rights [2] committed by 'threats, intimidation, or

coercion.'" <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1).  The Bane Act also requires "specific intent" to violate the victim's rights, for which "a reckless disregard for a person's constitutional rights" may be "evidence."  <u>Reese v. Cty. of Sacramento</u>, 888 F.3d 1030, 1045 (9th Cir. 2018); <u>accord</u> <u>Cornell v. City & Cty. of San Francisco</u>, 17 Cal. App. 5th 766, 803, 804 (2017) (where the constitutional right is "clearly delineated and plainly applicable," "[r]eckless disregard of the 'right at issue' is all that [is] necessary").  The "threat, intimidation, or coercion" element of the Bane Act need not be independent from the underlying constitutional violation.  <u>See</u> <u>Reese</u>, 888 F.3d at 1043-44.

Plaintiffs plausibly plead that the CDCR/San Quentin Defendants violated Polanco's constitutional rights, and they likely sufficiently plead specific intent.  But they do not plead that any Defendant used a "threat, intimidation, or coercion."  Plaintiffs seem to assume they have done so simply by pleading a Section 1983 claim.  <u>See</u> Opp. at 17-18.  But where courts hold that facts underlying a Section 1983 violation necessarily give rise to a Bane Act claim, they do so in the context of excessive force or wrongful arrest, where "threat, intimidation, or coercion" are invariably present.  <u>See, e.g.</u>, <u>Rodriguez v. Cty. of Los Angeles</u>, 891 F.3d 776, 801–02 (9th Cir. 2018) (excessive force); <u>Reese</u>, 888 F.3d at 1035–36 (same); <u>cf.</u> <u>Cameron v. Craig</u>, 713 F.3d 1012, 1022 (9th Cir. 2013) (stating, a bit imprecisely, that "the elements of [an] excessive force claim under § 52.1 are the same as under § 1983").  In rejecting a Bane Act claim, a California Court of Appeal recently distinguished the excessive force/wrongful arrest cases on the same ground, emphasizing that "[a]ny arrest without probable cause involves coercion."  <u>Schmid v. City & Cty. of San Francisco</u>, 60 Cal. App. 5th 470, 483 (2021).  Unlike an excessive force claim, a failure-to-protect claim does not automatically encompass "threat, intimidation, or coercion."  Of course, in some broad sense, "coercion" is implicated any time that an employer asks an employee to do his job.  <u>Cf.</u> Compl. ¶ 84 (seeming to allege that the work conditions constituted "threat, intimidation, or coercion").  But as currently pleaded, Plaintiffs do not come very close to suggesting that the "coercion" attendant with

United States District Court
Northern District of California

1   Polanco's employers instructing him to do his job during the COVID-19 outbreak at San

2   Quentin was a "threat, intimidation, or coercion" within the scope of the Bane Act.

3          Plaintiffs' various other arguments in their opposition are largely beside the point.

4   They make various correct statements about the Bane Act: it does not require violence, it

5   does not require discriminatory intent, it applies beyond hate crimes, "reckless disregard"

6   may satisfy the "specific intent" element, and the "threat, intimidation, or coercion"

7   element need not be separate from the core constitutional violation. See Opp. at 17-18;

8   Reese, 888 F.3d at 1043.  But Plaintiffs fail to cite cases with analogous types of "threat,

9   intimidation, or coercion" nor plead specific actions by Defendants that rise to the level of

10  the excessive force cases they cite.

11         As such, the Court dismisses the Bane Act claim with leave to amend.

12                     **3.      Negligent Infliction of Emotional Distress**

13         Finally, Plaintiffs' NIED claim fails because Plaintiffs do not allege that they

14  witnessed the actions or inactions by Defendants that caused the injury.  In general,

15  California law "limit[s] the right to recover for negligently caused emotional distress to

16  plaintiffs who personally and contemporaneously perceive the injury-producing event and

17  its traumatic consequences." Thing v. La Chusa, 48 Cal. 3d 644, 666 (1989).  The tortious

18  event need not necessarily be a "sudden occurrence." Ochoa v. Superior Ct., 39 Cal. 3d

19  159, 168 (1985).  For example, in Ochoa, the plaintiff stated an NIED claim based on

20  witnessing, repeatedly over several days, doctors' negligent care of her son that led to his

21  death.  Recovery was permitted because "there [was] observation of the defendant's

22  conduct and the [] injury and contemporaneous awareness the defendant's conduct or lack

23  thereof [was] causing harm." See id. at 169–70.

24         Plaintiffs do not allege that they observed the Defendants' conduct.  They allege

25  that they observed Polanco before and after his work shift, as well as in telephone calls

26  during his shifts, during which he would describe the circumstances of his work.  Compl. ¶

27  101.  They also witnessed the onset and worsening of his condition after he contracted

28  COVID-19.  Id. ¶¶ 58, 59, 101.  But although they were aware of the conduct of the

United States District Court
Northern District of California

Defendants that caused harm, they do not allege that they witnessed the conduct. Because that is insufficient under California law, the Court dismisses this claim with leave to amend.[5]

IV.      **CONCLUSION**

For the foregoing reasons, the Court GRANTS the motion to dismiss with respect to (1) the Section 1983 claims against the CIM Defendants; (2) the Bane Act claim; and (3) the negligent infliction of emotional distress claim. The Court DENIES the motion to dismiss as to (1) the Section 1983 claims against the CDCR/San Quentin Defendants; and (2) the Rehabilitation Act claim. The Court grants leave to amend. Plaintiffs may file an amended complaint within 30 days of this order.

**IT IS SO ORDERED.**

Dated: March 3, 2022



CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

---

[5] Defendants also argue that this claim is barred by the workers' compensation exclusivity rule. Because Plaintiffs' claim fails because they did not witness Defendants' conduct, the Court need not address this alternative argument at this time.